1

2

3

4

5

6

# UNITED STATES DISTRICT COURT

## EASTERN DISTRICT OF CALIFORNIA

7  JEWELL BARBER,                          )  1:10-CV-402 OWW JMD HC
                                          )
8              Petitioner,                )  FINDINGS AND RECOMMENDATIONS
                                          )  REGARDING PETITION FOR WRIT OF
9    v.                                   )  HABEAS CORPUS
                                          )
10 J.D. HARTNET,                          )
                                          )  OBJECTIONS DUE WITHIN THIRTY (30)
11             Respondent.                )  DAYS
   _____     )

12

13          Jewell Barber (hereinafter "Petitioner") is a prisoner proceeding pro se with a petition for

14  writ of habeas corpus pursuant to 28 U.S.C. § 2254.

15                          **PROCEDURAL HISTORY**

16          Petitioner is currently in the custody of the California Department of Corrections and

17  Rehabilitation pursuant to a 1983 conviction for second-degree murder.  The trial court sentenced

18  Petitioner to a prison term of fifteen years to life.  After having been denied parole on ten prior

19  occasions, on June 10, 2008, the California Board of Parole Hearings ("Board") conducted a hearing

20  and recommended that Petitioner be granted parole.  See Petitioner Exhibit ("Exh.") A.  On October

21  27, 2008, California Governor Arnold Schwarzenegger, reversed the Board's decision.  See

22  Petitioner Exh. B.  Petitioner filed habeas petitions challenging the Governor's denial of parole in all

23  three levels of the California courts.  On January 15, 2009, the Riverside County Superior Court

24  denied the petition.  See Respondent ("Resp't") Lodged 5.  The California Court of Appeal and the

25  California Supreme Court issued summary denials.  See Resp't Lodged 7,11 .  On April 23, 2009,

26  Petitioner filed the instant federal petition for writ of habeas corpus challenging the Governor's

27  denial of parole.  Petitioner claims the Governor violated his due process rights because there was no

28  evidence to support the finding that he currently posed an unreasonable risk of danger to the public if

1   released.  On July 28, 2009, Respondent filed a response to the petition.  On August 12, 2009,

2   Petitioner filed a traverse.

3                                    **FACTUAL BACKGROUND**

4        The Governor summarized the facts as follows:

5        On September 7, 1982, [Petitioner] and his crime partner shot and killed James Edward
         Bailey over a bad drug deal.

6        According to the probation report, prior to the murder, Heldon Jones, [Petitioner], and James
7        were involved in a PCP deal that went "sour."  James and [Petitioner] purchased PCP from
         Heldon on credit, and they were later unable to pay him back.  James and [Petitioner] blamed
8        each other for not being able to pay Heldon, and Heldon and James exchanged "bad words
         and even threats."

9        On the day of the murder, Heldon, Jewell and Emerson McCully sat around a kitchen table in
10       [Petitioner's] apartment.  Emerson mentioned that he was going to kill James and he left.
         But he returned a minute later and said that he could not kill James because there were too
11       many people around.  [Petitioner] left the apartment.  When he later returned, he said that
         James was in his apartment.  Emerson again said that he was going to kill James, and he left.
12       A short time later, there was a loud thud, and [Petitioner] went to James' apartment.  When
         [Petitioner] returned to his apartment, he said that James was lying on the floor.  Sometime
13       later that day, [Petitioner] and Heldon contacted Emerson, and Emerson said that [Petitioner]
         owed him money for killing James.

14
15       At approximately 1:50 p.m., officers arrived at James' apartment.  James was lying on the
         floor with a gunshot wound to the head.  James was transported to a hospital, where he was
16       placed on life support.  He died on September 18, 1982 from two .22-caliber gunshot wounds
         to the brain.

17       [Petitioner] was arrested several days after the shooting.  He pled no contest to second-degree
         murder, and he was sentenced to 15 years to life in prison.

18
19    See Resp't Lodged 3-Governor's decision at 1.

20        The Board's Decision

21        The Board determined that Petitioner did not pose an unreasonable risk to public safety for a

22   number of reasons.  First, Petitioner lacked a pre-commitment and post-commitment criminal history

23   of violence, did not have any previous record of assaulting others, and had no juvenile record that

24   involved crime.  See Parole Hearing Transcript ("Transcript") at 49, 53.[1]  Second, Petitioner had a

25   stable social history.  Petitioner maintained close family ties and relationships via visits, phone calls,

26   and letters.  See Transcript at 49-50.  Third, while in prison, Petitioner enhanced his ability to

27
28        [1]The transcript of the parole hearing is contained in Petitioner's writ of habeas corpus.  It is listed as Exh. A of the
     petition.

function within the law upon release by participating in self-help programs and other programs.  See Transcript at 50.  Fourth, in terms of vocational training, Petitioner had chosen to participate in paralegal activities.  See Transcript at 51.  Further, while in prison, Petitioner had focused on clerk positions for his job assignments and had received satisfactory evaluations for his assignments.  See Transcript at 51-52.  Fifth, Petitioner's 2007 psychological evaluation found that Petitioner's risk for violence was in the low range.  See Transcript at 52.  Petitioner's 2005 psychological evaluation was also favorable towards the inmate.  Id.  Sixth, Petitioner's maturation, growth, greater understanding and advanced age reduced his probability of recidivism.  See Transcript at 53, 54.  Seventh, Petitioner "understands insight into the crime, insight of what has happened to his victim, and insight he's taking full responsibility for his actions" and "this inmate clearly shows signs of remorse."  See Transcript at 54.  Eighth, Petitioner has viable parole plans, which include a place to live, and a job offer.  See Transcript at 56.  Finally, the Board acknowledged that while prior clinicians had described Petitioner's participation in Alcoholics Anonymous ("AA") and Narcotics Anonymous ("NA") as being episodic over the course of 25 years, Petitioner's overall psychological evaluations have been supportive.  See Transcript at 52-53.  The Board further noted that Petitioner's 2005 psychological report stated that:

> If granted release, it is recommended that this inmate undergo formal chemical dependency assessment and follow any recommendations made at that time.  This recommendation does not reflect a belief that this inmate is at a high risk for relapse.  It would remain prudent to monitor this inmate for drug use subsequent to his release.

See Transcript at 53.

The Governor's Decision

On October 27, 2008, the Governor reversed the Board's decision.  See Resp't Lodged 3- Governor's decision.  In his decision, the Governor recognized various positive factors which led to the Board's grant of parole.  Id.  The Governor provided that:

> [Petitioner] made efforts in prison to enhance his ability to function within the law upon release.  He completed vocational training in electronics and office machine repair.  In addition, [Petitioner] held institutional jobs such as porter and clerk.  He also availed himself of an array of self-help and therapy, including Alcoholic Anonymous, Narcotics Anonymous, Anger Management, Life Plan for Recovery, Alternatives to Violence, Men's Advisory Council, Yokefellow Group Counseling Program, Change the World, Cognitive Behavior Modification, Christian Discipleship, Hand Across Peace, Marriage and Family Counseling, and Category X.  He maintains seemingly solid relationships and close family ties with

1
2
3

supportive family and friends, and he received favorable evaluations from various correctional and mental-health professionals over the years. [Petitioner] also made plans upon his release to live with his sister in Riverside County, the county of his last legal residence. He has a job offer as a truck-driver.

See Resp't Lodged 3-Governor's decision at 1-2.

4
5

The Governor concluded, however, that:

6
7
8
9
10
11

Nonetheless, the second-degree for which [Petitioner] was convicted was especially atrocious because there is evidence that the murder was premeditated on some level. [Petitioner] and his crime partners planned the attack, and they spoke openly of killing James. Indeed, [Petitioner] knew that Heldon was upset because James had some of his money. When Heldon and Emerson met with [Petitioner], Heldon told [Petitioner] that Emerson would "take care of" James. It was agreed that Emerson would enter James' apartment under the pretense of buying drugs. However, when James refused to sell him drugs because he did not know him, [Petitioner] agreed to go to James' apartment and vouch for Emerson. Emerson went back to James' apartment. A short time later, he returned to [Petitioner's] apartment and said that he shot James. And after the shooting, Emerson demanded money from [Petitioner] for killing James.

12
13
14
15
16

[Petitioner] says that he accepts responsibility for his actions and that he is remorseful. However, [Petitioner's] version of the events changed significantly over the years, and the record indicates that he still lacks full insight into the circumstances of the murder and his responsibility for the offense. According to the probation report, [Petitioner] initially claimed he did not know about the killing. But [Petitioner] later told the probation officer that he was "a victim of circumstances." Next, in a 1998 type-written statement, [Petitioner] claimed that his only involvement in the murder was to introduce James to Emerson and to vouch for Emerson so that James would agree to sell him drugs. In the same type-written statement, [Petitioner] also claimed that he told James to "watch out for himself."

17
18
19
20
21
22

When asked at his 2002 parole hearing about his role in the murder, [Petitioner] told the Board of Parole Hearings (Board) that he did not plan the murder. However, during the same hearing, he also indicated that he offered to pay money in connection with the murder. In addition, [Petitioner] said that he was an unwilling participant in the murder. He also told the Board, "I was asked to do some things that I didn't want to do." Although, Jewell provided a detailed account of the offense in his 1998 statement, in 2005 he asked his correctional counselor to remove his statement, and he refused to provide an updated version of the crime for his Life Prisoner Evaluation. [Petitioner] now says that he endorses the official version of the facts contained in the probation report. Nonetheless, these significant changes to [Petitioner's] story over the years, including some very recent changes, indicate to me that [Petitioner] has not gained sufficient insight into the circumstances of the offense so that he can avoid such circumstances in the future.

23
24
25
26

When he committed this crime, [Petitioner] was 26 years old. He has no known juvenile record, but as an adult he was previously convicted of trespassing and driving under the influence. In addition, he was arrested, but not convicted, of disobeying a court order, petty theft, and possessing a controlled substance. [Petitioner] told his 1999 mental-health evaluator that he began to use alcohol and marijuana at age 13 or 14. He also admitted that he tried cocaine and PCP, and he stated that he consumed alcohol on the day of the life offense. Further, [Petitioner] was involved in selling drugs despite the fact that he was

27
28

gainfully employed at the time.[2]  In light of [Petitioner's] history of drug and alcohol abuse, and drug sales, I am concerned by [Petitioner's] sporadic participation in substance-abuse treatment in prison.  When asked about substance-abuse treatment, [Petitioner] told his 2005 mental-health evaluator that "it is not necessary treatment for him."  I disagree, particularly because the 2005 evaluator also noted that [Petitioner] is "slightly more likely than the average citizen to become involved in violence."  Coupled with his history of substance abuse, this evaluation signals to me that [Petitioner] would benefit from additional – and consistent – participation in substance-abuse treatment in prison.

I am also concerned by the reports of [Petitioner's] failure to acknowledge the Board's previous recommendations that he participate in vocational programs in prison. [Petitioner completed his last vocational program nearly 18 years ago, despite the fact that numerous panels encouraged him to upgrade vocationally.  As recently as 2008, the Board remarked, "it's been quite  a long time since you've been in any kind of vocational training."  Maintaining regular involvement in vocational training will provide [Petitioner] with knowledge and skills necessary to succeed upon release from prison.

The gravity of the life offense supports my decision, but I am especially concerned about [Petitioner's] inconsistent substance-abuse treatment, his limited participation in vocational programs, and the evidence suggesting that [Petitioner] does not have full insight into the circumstances of the murder.  This information indicates to me that [Petitioner] would present a current unreasonable risk of danger to society if released at this time.  The Riverside County District Attorney's Office agrees, registering its opposition to parole with the 2008 Board.

At age 52 now, after being incarcerated for more than 26 years, [Petitioner] made some creditable gains in prison.  But given the current record before me, and after carefully considering the very same factors that the Board must consider, I believe [Petitioner's] release from prison would pose an unreasonable risk of danger to society at this time.  Accordingly, I REVERSE the Board's 2008 decision to grant parole to [Petitioner].

See Resp't Lodged 3-Governor's decision at 1-3.

The Superior Court Decision

Petitioner's state habeas petition in Riverside County was denied.  See Resp't Lodged 5.  The denial reads, in its entirety:

The Court, having read and considered the Petition for Writ of Habeas Corpus presented the 4th day of December 2008, hereby orders the following:

Petitioner JEWELL BARBER is serving a sentence of fifteen years to life for second-degree murder.  Petitioner's commitment date was June 2, 1983.  On June 10, 2008, the Board of Parole hearings (BPH) held its tenth parole hearing on Petitioner.  Following the presentation of evidence and review of Petitioner's file, the BPH found Petitioner suitable for parole.  In a letter decision dated October 27, 2008, Governor Arnold Schwarzenegger reversed the BPH decision concluding that Petitioner would pose an unreasonable risk of danger to society.  Petitioner challenges the Governor's decision arguing that it was arbitrary, capricious, and not supported by the record.  Essentially, Petitioner's arguments all challenge the sufficiency

---

[2]The Court notes that this factual finding is not supported by the record.  The record indicates that Petitioner was unemployed at the time of the offense.  See Petitioner's Exh. C-2007 psychological evaluation at 6; Petitioner's Exh. C-2005 psychological evaluation at 3; Petitioner's Exh. C-2002 psychological evaluation at 6.

1  of the evidence in support of the Governor's finding that he remains an unreasonable risk to
public safety if released from prison.

2

3  This court reviews the Governor's decision based upon the "some evidence" standard set
forth by the California Supreme Court.  (See In re Rosenkrantz (2002) 29 Cal.4th 616.)
Having reviewed the record before the BPH, this court finds that there is some evidence in

4  the record to support Governor Schwarzenegger's decision to reverse the BPH grant of
parole.

5

6  Based on the review of the entire record, the petition is denied pursuant to California Rule of
Court 4.551.

7  See Resp't Lodged 5.

8

9  **DISCUSSION**

**I.**  **Jurisdiction**

10

11      A person in custody pursuant to the judgment of a State court may petition a district court for

relief by way of a writ of habeas corpus if the custody is in violation of the Constitution, laws, or

12  treaties of the United States.  28 U.S.C. § 2254(a); 28 U.S.C. § 2241(c)(3); Williams v. Taylor, 529

13  U.S. 362, 375 n.7 (2000).  Petitioner asserts that he suffered violations of his rights as guaranteed by

14  the United States Constitution.  Petitioner is currently incarcerated at Avenal State Prison, which is

15  located in Kings County.  As Kings County falls within this judicial district, 28 U.S.C. § 84(b), the

16  Court has jurisdiction over Petitioner's application for writ of habeas corpus.  See 28 U.S.C. §

17  2241(d) (vesting concurrent jurisdiction over application for writ of habeas corpus to the district

18  court where the petitioner is currently in custody or the district court in which a State court convicted

19  and sentenced Petitioner if the State "contains two or more Federal judicial districts").

20

**II.**  **Standard of Review**

21

22      On April 24, 1996, Congress enacted the Anti-terrorism and Effective Death Penalty Act of

1996 ("AEDPA"), which applies to all petitions for a writ of habeas corpus filed after the statute's

23  enactment.  Lindh v. Murphy, 521 U.S. 320, 326-27 (1997); Jeffries v. Wood, 114 F.3d 1484, 1499

24  (9th Cir. 1997).  The instant petition was filed after the enactment of AEDPA and is consequently

25  governed by its provisions.  See Lockyer v. Andrade, 538 U.S. 63, 70 (2003).  Thus, the petition

26  "may be granted only if [Petitioner] demonstrates that the state court decision denying relief was

27  'contrary to, or involved an unreasonable application of, clearly established Federal law, as

28

1    determined by the Supreme Court of the United States.'" Irons v. Carey, 505 F.3d 846, 850 (9th Cir.

2    2007) (quoting 28 U.S.C. § 2254(d)(1)), overruled in part on other grounds, Hayward v. Marshall,

3    603 F.3d 546, 555 (9th Cir. 2010) (en banc); see Lockyer, 538 U.S. at 70-71.

4          Title 28 of the United States Code, section 2254 remains the exclusive vehicle for

5    Petitioner's habeas petition as Petitioner is in the custody of the California Department of

6    Corrections and Rehabilitation pursuant to a state court judgment.  See Sass v. California Board of

7    Prison Terms, 461 F.3d 1123, 1126-27 (9th Cir. 2006) overruled in part on other grounds, Hayward,

8    603 F.3d at 555.  As a threshold matter, this Court must "first decide what constitutes 'clearly

9    established Federal law, as determined by the Supreme Court of the United States.'" Lockyer, 538

10   U.S. at 71 (quoting 28 U.S.C. § 2254(d)(1).  In ascertaining what is "clearly established Federal

11   law," this Court must look to the "holdings, as opposed to the dicta, of [the Supreme Court's]

12   decisions as of the time of the relevant state-court decision."  Id. (quoting Williams v. Taylor, 529

13   U.S. 362, 412 (2000)).  "In other words, 'clearly established Federal law' under § 2254(d)(1) is the

14   governing legal principle or principles set forth by the Supreme Court at the time the state court

15   renders its decision."  Id.  Finally, this Court must consider whether the state court's decision was

16   "contrary to, or involved an unreasonable application of, clearly established Federal law."  Id. at 72

17   (quoting 28 U.S.C. § 2254(d)(1)).  "Under the 'contrary to' clause, a federal habeas court may grant

18   the writ if the state court arrives at a conclusion opposite to that reached by [the Supreme] Court on a

19   question of law or if the state court decides a case differently than [the] Court has on a set of

20   materially indistinguishable facts."  Williams, 529 U.S. at 413; see also Lockyer, 538 U.S. at 72.

21   "Under the 'unreasonable application clause,' a federal habeas court may grant the writ if the state

22   court identifies the correct governing legal principle from [the] Court's decisions but unreasonably

23   applies that principle to the facts of the prisoner's case."  Williams, 529 U.S. at 413.  "[A] federal

24   court may not issue the writ simply because the court concludes in its independent judgment that the

25   relevant state court decision applied clearly established federal law erroneously or incorrectly.

26   Rather, that application must also be unreasonable."  Id. at 411.  A federal habeas court making the

27   "unreasonable application" inquiry should ask whether the State court's application of clearly

28   established federal law was "objectively unreasonable."  Id. at 409.

Petitioner bears the burden of establishing that the state court's decision is contrary to or involved an unreasonable application of United States Supreme Court precedent.  Baylor v. Estelle, 94 F.3d 1321, 1325 (9th Cir. 1996).  Although only Supreme Court law is binding on the states, Ninth Circuit precedent remains relevant persuasive authority in determining whether a state court decision is objectively unreasonable.  Clark v. Murphy, 331 F.3d 1062, 1072 (9th Cir. 2003) ("While *only* the Supreme Court's precedents are binding on the Arizona court, and only those precedents need be reasonably applied, we may look for guidance to circuit precedents"); Duhaime v. Ducharme, 200 F.3d 597, 600-01 (9th Cir. 1999) ("because of the 1996 AEDPA amendments, it can no longer reverse a state court decision merely because that decision conflicts with Ninth Circuit precedent on a federal Constitutional issue....This does not mean that Ninth Circuit case law is never relevant to a habeas case after AEDPA. Our cases may be persuasive authority for purposes of determining whether a particular state court decision is an 'unreasonable application' of Supreme Court law, and also may help us determine what law is 'clearly established'").  Furthermore, the AEDPA requires that the Court give considerable deference to state court decisions.  The state court's factual findings are presumed correct.  28 U.S.C. § 2254(e)(1).  A federal habeas court is bound by a state's interpretation of its own laws.  Souch v. Schaivo, 289 F.3d 616, 621 (9th Cir. 2002).

The initial step in applying AEDPA's standards is to "identify the state court decision that is appropriate for our review."  Barker v. Fleming, 423 F.3d 1085, 1091 (9th Cir. 2005).  Where more than one State court has adjudicated Petitioner's claims, a federal habeas court analyzes the last reasoned decision.  Id.  Thus, a federal habeas court looks through ambiguous or unexplained state court decisions to the last reasoned decision to determine whether that decision was contrary to or an unreasonable application of clearly established federal law.  Bailey v. Rae, 339 F.3d 1107, 1112-1113 (9th Cir. 2003).  If the dispositive state court order, however, does not "furnish a basis for its reasoning," federal habeas courts must conduct an independent review of the record to determine whether the state court's decision is contrary to, or an unreasonable application of, clearly established Supreme Court law.  See Delgado v. Lewis, 223 F.3d 976, 982 (9th Cir.2000) overruled on other grounds, Lockyer, 538 U.S. at 75-76; see also Himes v. Thompson, 336 F.3d 848, 853 (9th Cir.

1   2003).  Here, the Superior Court reached a decision on the merits and concluded that some evidence

2   existed to support the Governor's decision.  The Superior Court, however, did not provide reasoning

3   to support its conclusion.  The California Court of Appeal and the California Supreme Court also

4   denied Petitioner's habeas petitions without analysis.  Accordingly, the Court will conduct an

5   independent review of the record to ascertain whether the state court's denial was contrary to or

6   involved an unreasonable application of Supreme Court precedent.

7   **III.    Review of Petitioner's Claims**

8         The petition for writ of habeas corpus sets several grounds for relief, which all contend that

9   Petitioner's due process rights were violated by the Governor's denial of parole.  Petitioner asserts

10  the following arguments: (1) the Governor's decision was not supported by "some evidence;" (2)

11  there is no nexus between Petitioner's commitment offense and current dangerousness given the

12  passage of time; (3) the commitment offense was not particularly egregious for a second-degree

13  murder; and (4) the evidence in the record demonstrates that Petitioner has expressed genuine

14  remorse and does have appropriate insight into the circumstances of the crime.

15        The Court analyzes Petitioner's due process claims in two steps: "the first asks whether there

16  exist[s] a liberty or property interest which has been interfered with by the State; the second

17  examines whether the procedures attendant upon that deprivation were constitutionally sufficient."

18  Sass, 461 F.3d at 1127.  The United States Constitution does not, by itself, create a protected liberty

19  interest in a parole date.  Jago v. Van Curen, 454 U.S. 14, 17-21 (1981).  The Ninth Circuit Court of

20  Appeals has recognized that "[i]f there is any right to release on parole, or to release in the absence

21  of some evidence of future dangerousness, it has to arise from substantive state law creating a right

22  to release."  Hayward, 603 F.3d at 555.  The Ninth Circuit further recognized that "[t]here is no

23  general federal constitutional 'some evidence' requirement for denial of parole, in the absence of

24  state law creating an enforceable right to parole."  Id. at 559.  The Hayward court's finding, that there

25  exists no free standing federal due process right to parole or the federal right to some evidence of

26  current dangerousness, contained the consistent and continual caveat that state law may in fact give

27  rise to federal protection for those rights.  As the Ninth Circuit later reiterated, "state created rights

28  may give rise to liberty interests that may be enforced as a matter of federal law."  Pearson v. Muntz,

606 F.3d 606, 609 (9th Cir. 2010) (per curiam) (citing Wilkinson v. Austin, 545 U.S. 209, 221 (2005)).  The Pearson court found that, "Hayward necessarily held that compliance with state requirement is mandated by federal law, specifically the Due Process Clause" as "[t]he principle that state law gives rise to liberty interests that may be enforced as a matter of federal law is long-established."  Id.

The next question is whether California's parole scheme gives rise to a liberty interest enforced as a matter of federal law.  The Ninth Circuit has definitively concluded that "California has created a parole system that independently requires the enforcement of certain procedural and substantive rights, including the right to parole absent 'some evidence' of current dangerousness." Id. at 611 (citing Hayward, 603 F.3d at 562); see also Cooke v. Solis, 606 F.3d 1206, 1213 (9th Cir. 2010) (noting that "California's 'some evidence' requirement is a component of the liberty interest created by the parole system of that state").  Consequently, the inquiry that a federal habeas court must undertake in determining whether the denial of parole comports with the requirement of federal due process is "whether the California judicial decision approving the governor's [or parole board's] decision rejecting parole was an 'unreasonable application' of the California 'some evidence' requirement, or was 'based on an unreasonable determination of the facts in light of the evidence.'" Hayward, 603 F.3d at 563 (quoting 28 U.S.C. § 2254(d)(1)-(2)) (footnotes omitted).

Under California law, with respect to an eligible "life prisoner," the BPH "must 'normally set a parole release date' before the minimum term has been served," but "an inmate shall be found unsuitable for parole and denied parole if, in the judgment of the [BPH], the prisoner will pose an unreasonable risk of danger to society if released from prison."  In re Dannenberg, 34 Cal.4th 1061, 1078, 1080 (2005) (quoting 15 C.C.R. § 2402(a)); see also In re Lawrence, 44 Cal.4th 1181, 1204 (2008).  The BPH determines whether a prisoner is presently too dangerous to be released on parole by examining criteria set forth in regulations.  See 15 C.C.R. § 2402; Irons, 505 F.3d at 851-52; Biggs v. Terhune, 334 F.3d 910, 915-16 (9th Cir. 2003).  The criteria set by regulation reads:

> (b) All relevant, reliable information available to the panel shall be considered in determining suitability for parole. Such information shall include the circumstances of the prisoner's social history; past and present mental state; past criminal history, including involvement in other criminal misconduct which is reliably documented; the base and other commitment offenses, including behavior before, during and after

the crime; past and present attitude toward the crime; any conditions of treatment or control, including the use of special conditions under which the prisoner may safely be released to the community; and any other information which bears on the prisoner's suitability for release. Circumstances which taken alone may not firmly establish unsuitability for parole may contribute to a pattern which results in a finding of unsuitability.

(c) The following circumstances each tend to indicate unsuitability for release. These circumstances are set forth as general guidelines; the importance attached to any circumstance or combination of circumstances in a particular case is left to the judgment of the panel. Circumstances tending to indicate unsuitability include:

    (1) Commitment Offense. The prisoner committed the offense in an especially heinous, atrocious or cruel manner. The factors to be considered include:

        (A) Multiple victims were attacked, injured or killed in the same or separate incidents.

        (B) The offense was carried out in a dispassionate and calculated manner, such as an execution-style murder.

        (C) The victim was abused, defiled or mutilated during or after the offense.

        (D) The offense was carried out in a manner which demonstrates an exceptionally callous disregard for human suffering.

        (E) The motive for the crime is inexplicable or very trivial in relation to the offense.

    (2) Previous Record of Violence. The prisoner on previous occasions inflicted or attempted to inflict serious injury on a victim, particularly if the prisoner demonstrated serious assaultive behavior at an early age.

    (3) Unstable Social History. The prisoner has a history of unstable or tumultuous relationships with others.

    (4) Sadistic Sexual Offenses. The prisoner has previously sexually assaulted another in a manner calculated to inflict unusual pain or fear upon the victim.

    (5) Psychological Factors. The prisoner has a lengthy history of severe mental problems related to the offense.

    (6) Institutional Behavior. The prisoner has engaged in serious misconduct in prison or jail.

(d) The following circumstances each tend to show that the prisoner is suitable for release. The circumstances are set forth as general guidelines; the importance attached to any circumstance or combination of circumstances in a particular case is left to the judgment of the panel. Circumstances tending to indicate suitability include:

    (1) No Juvenile Record. The prisoner does not have a record of assaulting others as a juvenile or committing crimes with a potential of personal harm to victims.

    (2) Stable Social History. The prisoner has experienced reasonably stable relationships with others.

    (3) Signs of Remorse. The prisoner performed acts which tend to indicate the presence of remorse, such as attempting to repair the damage, seeking help for or relieving suffering of the victim, or indicating that he understands the nature and magnitude of the offense.

    (4) Motivation for Crime. The prisoner committed his crime as the result of significant stress in his life, especially if the stress has built over a long period of time.

    (5) Battered Woman Syndrome. At the time of the commission of the crime, the prisoner suffered from Battered Woman Syndrome, as defined in section 2000(b), and it appears the criminal behavior was the result of that

victimization.
(6) Lack of Criminal History. The prisoner lacks any significant history of
    violent crime.
(7) Age. The prisoner's present age reduces the probability of recidivism.
(8) Understanding and Plans for Future. The prisoner has made realistic plans
    for release or has developed marketable skills that can be put to use upon release.
(9) Institutional Behavior. Institutional activities indicate an enhanced ability
    to function within the law upon release.

15 C.C.R. § 2402(b), (c), (d). The Governor has the authority to review the Board's decision to grant

parole to a prisoner convicted of murder. Cal. Const., art. V, §8 (b); Cal. Penal Code §3041.2.

When determining whether to reverse a grant of parole, the Governor must apply the same factors

that guide the Board's decision. In re Rosenkrantz, 29 Cal. 4th 616, 659 (2002).

    The key inquiry is whether some evidence supports the conclusion that the prisoner currently

poses an unreasonable risk of danger to society. See In re Lawrence, 44 Cal.4th at 1210, 1227; In re

Roderick, 154 Cal.App.4th 242, 263 (2007); In re Lee, 143 Cal.App.4th 1400, 1408 (2006); see also

Cooke, 606 F.3d 1206 at 1214. There is "some evidence" to support a finding if there is at least "a

modicum" of evidence. Lawrence, 44 Cal.4th at 1226. There also must be a nexus between the

factors that are cited by the BPH or the Governor and the determination of current dangerousness.

See Lawrence, 44 Cal.4th at 1210; In re Rico, 171 Cal.App.4th 659, 686 (2009); In re Palermo, 171

Cal.App.4th 1096, 1107 (2009). The denial of parole will not be upheld where the BPH "attaches

significance to evidence that forewarns no danger to the public or relies on an unsupported

conclusion." In re Tripp, 150 Cal.App.4th 306, 313 (2007).

    With respect to the commitment offense, the California Supreme Court has explained:

    [T]he Board or the Governor may base a denial-of-parole decision upon the
    circumstances of the offense, or upon other immutable facts such as an inmate's
    criminal history, but some evidence will support such reliance only if those facts
    support the ultimate conclusion that an inmate continues to pose an unreasonable risk
    to public safety. Accordingly, the relevant inquiry for a reviewing court is not merely
    whether an inmate's crime was especially callous, or shockingly vicious or lethal, but
    whether the identified facts are probative to the central issue of current dangerousness
    when considered in light of the full record before the Board or the Governor.

Lawrence, 44 Cal.4th at 1221. The nature of the commitment offense may combine with other

factors, such as post-incarceration history or current mental state and demeanor, to support a finding

of unreasonable dangerousness. See id. at 1214; see also Hayward, 603 F.3d at 562. Depending

upon the circumstances, factors such as the passage of time and the prisoner's age may make

1  continued reliance on unchanging factors like the nature of the commitment offense unreasonable.

2  See Lawrence, 44 Cal.4th at 1218-19, 1221; Roderick, 154 Cal.App.4th at 77; Lee, 143 Cal.App.4th

3  at 1412; In re Elkins, 144 Cal.App.4th 475, 498-500 (2006).  "In sum, a reviewing court must

4  consider 'whether the identified facts are *probative* to the central issue of *current* dangerousness

5  when considered in light of the full record before the Board or the Governor.'" Cooke, 606 F.3d at

6  1214 (emphasis in original) (citing Hayward v. Marshall, 603 F.3d at 560).

7         Here, the Governor noted four factors in denying Petitioner parole relying on:  (1) the gravity

8  of the underlying offense; (2) Petitioner's lack of full insight into the circumstances of the

9  commitment offense; (3) Petitioner's inconsistent substance-abuse treatment; and (4) Petitioner's

10  limited participation in vocational programs.  See Resp't Lodged 3-Governor's decision at 2-3.  The

11  Court's review of the record reveals that the third factor relied on by the Governor satisfies the

12  "some evidence" standard.

13         A.      Governor's First Reason for Denying Parole: Nature of Petitioner's Crime

14         The first factor the Governor cited for Petitioner's unsuitability for parole was the

15  commitment offense, which the Governor characterized as "especially atrocious." See Resp't Lodged

16  3-Governor's decision.  The Governor concluded that the crime was especially atrocious because

17  "there is evidence that the murder was premeditated on some level." Id.

18         A prisoner's crime constitutes a factor tending to demonstrate unsuitability for parole, where

19  the prisoner committed the offense "in an especially heinous, atrocious, or cruel manner." Cal. Code

20  Regs., Tit. 15, § 2402 (c)(1).  Under the regulation, among the circumstances that support a finding

21  that the prisoner committed the offense in this manner is that "the offense was carried out in a

22  dispassionate and calculated manner, such as an execution-style murder." Id.  The Court does not

23  find that Petitioner's offense was committed "in an especially heinous, atrocious or cruel manner."

24  See Cal. Admin. Code Tit. 15, §2402(c)(1).  Petitioner's crime was no more atrocious than whenever

25  one human being kills another.  The circumstances of the crime indicate that prior to the murder,

26  Petitioner, Heldon, and James were involved in a drug deal that went "sour."  See Resp't Lodged 3-

27  Governor's decision at 1.  On the day of the murder, Emerson mentioned to Petitioner and Heldon

28  that he was going to kill James.  Id.  Emerson went to James' apartment under the pretense of buying

drugs.  James refused to sell drugs to Emerson because he did not know him.  Petitioner agreed to go to James' apartment and vouch for Emerson.  Id.  After Petitioner vouched for Emerson,  Emerson went to James's apartment and shot James twice in the head.  See Resp't Lodged 3-Governor's decision at 3.

"The measure of atrociousness is not general notions of common decency or social norms, for by that yardstick all murders are atrocious."  See Lee, 143 Cal.App 4th at 1410.  "'[A]ll second degree murders by definition involve some callousness-i.e., lack of emotion or sympathy, emotional insensitivity, indifference to the feelings and suffering of others.... (citations omitted)."  In re Scott, 119 Cal. App. 4th 871, 891 (2004).  Rather, the inquiry is whether among murders the one committed by Petitioner was particularly heinous, atrocious or cruel.  See Lee, 143 Cal. App. 4th at 1410.  Comparing Petitioner's crime to those of defendants for whom the Board or Governor denied parole because the defendants' crimes were atrocious reveals that Petitioner's crime was more commonplace than atrocious.  See Rosenkrantz, 29 Cal. 4th at 678, (defendant killed his victim after a "full week of careful preparation, rehearsal and execution" and fired 10 shots at close range from an assault weapon and at least three or four shots into the victims head as he lay on the pavement); see also Dannenberg, 34 Cal. 4th at 1095 (defendant struck his victim multiple times in the head with a pipe wrench and then placed her head into a bathtub full of water); In re Van Houten, 116 Cal.App. 4th 339 (2004) (defendant participated in the premeditated mutilation of two victims and stabbed one victim a total of 42 times).  Unlike Rosenkrantz, Petitioner's offense did not involve elaborate or prolonged premeditation as the Petitioner and his crime partners appeared to have discussed the plan to attack James on the day of the murder.  See Resp't Lodged 3-Governor's decision at 1.  Moreover, unlike Rosenkrantz, Dannenberg, and Van Houten, the offense in question was not committed in a more aggravated or violent manner than that ordinarily shown in the commission of a second-degree murder.  Here, the victim was only shot twice by Petitioner's crime partner.[3]  See Resp't Lodged 3-Governor's decision at 2.  Therefore, the Court finds that some evidence does not support the Governor's characterization of the murder as being especially atrocious.

Furthermore, the Court cannot find that the commitment offense-no matter how

---

[3]The Court in no way minimizes the seriousness of the offense.

1    characterized- is probative of Petitioner's current dangerousness due to the passage of time and

2    petitioner's favorable post-commitment conduct.  As the California Supreme Court noted:

3         although the Board and the Governor may rely upon the aggravated circumstances of
          the commitment offense as a basis for a decision denying parole, the aggravated
4         nature of the crime does not in and of itself provide some evidence of *current*
          dangerousness to the public unless the record also establishes that something in the
5         prisoner's pre- or post-incarceration history, or his or her current demeanor and mental
          state, indicates that the implications regarding the prisoner's dangerousness that derive
6         from his or her commission of the commitment offense remain probative to the
          statutory determination of a continuing threat to public safety.

7    Lawrence, 44 Cal.4th at 1214 (emphasis in original) (cited in Cooke, 606 F.3d at 1216).

8    The Lawrence court further held that even when the commitment offense was particularly egregious,

9    reliance on this immutable factor would violate a petitioner's due process rights under the

10   regulations and statutes governing parole suitability in California where:

11        evidence of the inmate's rehabilitation and suitability for parole under the governing statutes
          and regulations is overwhelming, the only evidence related to unsuitability is the gravity of
12        the offense, and that offense is both temporally remote and mitigated by circumstances
          indicating the conduct is unlikely to recur, the immutable circumstance that the commitment
13        offense involved aggravated conduct does not provide 'some evidence' *inevitably* supporting
          the ultimate decision that the inmate remains a threat to public safety.
14

15   Lawrence, 44 Cal. 4th at 1191 (emphasis in original).

16        In Lawrence, the California Supreme Court found that a commitment offense occurring over

17   thirty-years prior to the Governor's denial of parole was no longer probative of the Petitioner's

18   current dangerousness.  The Lawrence court found that the intervening thirty-years in which

19   petitioner, now age sixty-one, had rendered "the unchanging factor of the gravity of petitioner's

20   commitment offense" no longer probative of current dangerousness and therefore could not

21   constitute some evidence." Id. at 1226.

22        Here, the commitment offense occurred in 1982; thus twenty-six years had passed from the

23   time Petitioner committed the crime to when the Governor found the circumstances of that crime

24   evidenced Petitioner's current dangerousness.  Petitioner was twenty-six years old when he

25   committed the offense and is now fifty-five years old.  The record in this case contains substantial

26   evidence of Petitioners' rehabilitation and suitability for parole, including: (1) Petitioner's favorable

27   psychological reports - the most recent which found that Petitioner's risk for violence within the

28   community would be equal to that of the average citizen and which indicated that Petitioner had

insight into the crime and showed clear signs of remorse (see Petitioner's Exh. C-2007 psychological report at 5-6); (2) Petitioner's lack of any pre-commitment criminal history of violence with the exception of the commitment offense and the lack of any post-commitment history of violence (see Transcript at 49, 53); (3) extensive self-improvement through completion of various self-help programs (see Transcript at 50); (4) viable parole plans (see Transcript at 56); and (5) stable social history (see Transcript at 56).

Accordingly, the Court finds that the intervening twenty-six years between the circumstances of the commitment offense and the parole hearing as well as Petitioner's extensive rehabilitative efforts have rendered the circumstances of the commitment offense no longer probative of Petitioner's current dangerousness.

B.   Governor's Second Reason for Denying Parole: Lack of Insight

The second reason the Governor cited for denying Petitioner parole was Petitioner's perceived lack of insight and acceptance of responsibility. The Governor concluded that Petitioner lacked insight because Petitioner's version of the events had changed significantly over the years. See Resp't Lodged 3-Governor's decision at 2. First, the Governor stated that according to the probation report, Petitioner initially claimed that he did not know about the killing and that he later told the probation officer that he was "a victim of circumstances." Id. The Court does not find these statements to be probative of current dangerousness due to the passage of twenty-six years and given that Petitioner's psychological reports dated from 1999 through 2007 indicate that Petitioner has obtained insight and accepted responsibility as discussed more fully below.[4]

Second, the Governor noted that in 1998, Petitioner claimed in a type-written statement[5] that his only involvement in the murder was to introduce James to Emerson and to vouch for Emerson so that James would agree to sell him drugs. See Resp't Lodged 3-Governor's decision at 2. The Court does not find this statement to be probative of dangerousness in light of the passage of time and the

---

[4] The Governor did not provide the probation report or the date of the report. Therefore, the date of the probation report is unclear. Presumably, however, the probation report was generated at or near the time of Petitioner's conviction and/or sentencing, which was approximately 26 years ago from the date of his 2008 parole hearing.

[5] The Governor did not provide the type-written statement. Nonetheless, the Court assumes the facts are as alleged by the Governor.

fact that Petitioner's psychological evaluations indicate that Petitioner has obtained insight into the

crime and has taken full responsibility for his actions.  For instance, Petitioner's most recent

psychological report dated March 15, 2007, provides that:

> The inmate acknowledges he committed the offense.  He fully acknowledges the
> wrongfulness of his actions.  The inmate appears to take full responsibility for the offense
> and does not appear to rationalize or minimize his role.  He appeared to fully express remorse
> for his actions.  When asked, he shared extensive expressions of guilt to remorse.

See Petitioner's Exh. C-2007 psychological report at 5.  The 2007 report further provided that: "The

inmate agrees with the review of the crime told by the inmate presented in Dr. Payne's report dated

June 11, 2002 and presented to the Board of Prison Terms."  Id.  Petitioner's October 2, 2005

psychological report was also favorable.  The 2005 report provided the following regarding

Petitioner's insight: "The inmate acknowledges he committed the offense.  He fully acknowledges

the wrongfulness of his actions.  He appeared to express significant remorse for his actions.... The

inmate demonstrated an awareness of the circumstances that resulted in his committing a serious

offense." See Petitioner's Exh. C- 2005 psychological report at 5-6.  Petitioner's psychological

report dated June 11, 2002, indicated that "[Petitioner] exhibited insight into and remorse for his past

actions, as well as empathy for the victim and his family." See Petitioner's Exh. C-2002

psychological report at 6.  Petitioner's psychological report dated March 2, 1999, provided that:

"The inmate's version of the instant offense does not differ significantly from the official version."

See Petitioner's Exh. C-1999 psychological report at 5.  The 1999 report stated that: "[Petitioner] has

gained significant insight into the predisposing factors and has taken advantage of whatever self help

programming has been available to him to help him grow in this regard." Id.  The 1999 report

further provided that:  "[Petitioner] has accepted responsibility for his acts and worked at every point

during his incarceration towards his own self development." Id. at 6.  Overall, Petitioner's

psychological evaluations reveal that Petitioner has demonstrated insight into his crime and

acceptance of responsibility, and has accepted the official version of the events since at least 1999.

Moreover, as the Board explained:

> This inmate clearly shows signs of remorse and he showed signs of remorse in his closing
> statement, he read it.  He talked about it, he addressed, the victims.  He addressed the
> victim's family.  That was, clearly shows that he understands insight into the crime, insight of
> what has happened to his victim, and insight he's taking full responsibility for his actions.

1  See Transcript at 54.  Accordingly, in light of the Petitioner's favorable psychological evaluations

2  and due to the passage of time, the Court does not find that Petitioner's 1998 statement demonstrates

3  a lack of insight that is probative of current dangerousness.

4          Lastly, the Governor noted that:

5      When asked at his 2002 parole hearing about his role in the murder, [Petitioner] told the
       Board of Parole Hearings (Board) that he did not plan the murder.  However, during the same
6      hearing, he also indicated that he offered to pay money in connection with the murder.  In
       addition, [Petitioner] said that he was an unwilling participant in the murder.  He also told the
7      Board, "I was asked to do some things that I didn't want to do.

8  See Resp't Lodged 3-Governor's decision at 2.  The Court does not find that Petitioner's statements

9  at his 2002 parole hearing[6] constitute a significant change in Petitioner's version of the events.

10          First, Petitioner's statement that he did not plan the murder but offered to pay money in

11 connection with the murder is not inconsistent with the official version of the crime.  Based on the

12 Governor's summary of the crime, Heldon and Emerson told Petitioner that Emerson would "take

13 care of" James because James had some of Heldon's money.  See Resp't Lodged 3-Governor's

14 decision at 1.  On the day of the murder, Emerson went to James' apartment to kill him under the

15 guise of selling drugs.  Id. at 2.  Because James refused to sell drugs to Emerson, Petitioner  agreed

16 to go up to James' apartment to vouch for Emerson.  Id.  In Petitioner's statements to the Board,

17 Petitioner did not deny his knowledge or ultimate participation in the murder plan.  Rather, it appears

18 that Petitioner is explaining that he did not create the murder plan.  Petitioner's explanation is

19 consistent with the official version because the official version seems to indicate that Emerson and

20 Heldon initiated the murder plan because Heldon believed that James had shorted him money.

21          Second, regarding Petitioner's statements at his 2002 parole hearing that he was "an

22 unwilling participant in the murder" and that he was asked "to do some things that [he] didn't want

23 to do," the Court does not find them to be inconsistent with Petitioner's earlier verison of the events.

24 In 2002, Petitioner presented his version of the life crime to Dr. Payne, who authored Petitioner's

25

26

27
   ─────────────────
28      [6]The Governor did not provide the 2002 parole hearing transcript.  Nevertheless, the Court assumes the facts are
   as alleged by the Governor.

2002 psychological report.[7]  Regarding the life crime, the 2002 report indicates that Petitioner was aware that Heldon was upset with James because of a monetary dispute and that Emerson was going to kill James.  See Petitioner's Exh. C- 2002 psychological report at 5.  Because James would not sell drugs to Emerson, Petitioner agreed to go up to James' apartment to vouch for Emerson.  Id.  Petitioner said that the did not know what to do at the time and was in fear of his life as his co-partners had a gun.  Id.  Petitioner's statements to the Board in 2002 are not inconsistent with the Petitioner's version of the life crime because Petitioner is not denying that he had knowledge of the murder plan and ultimately participated in the murder.  Instead, Petitioner's statements about being an unwilling participant appear to be a reference to Petitioner's fear for his life at the hands of his crime partners, which is detailed in Petitioner's 2002 psychological report.  Accordingly, the Governor's finding that Petitioner lacked insight is not supported by the record.

C.   Governor's Third Reason for Denying Parole: Inconsistent Substance Abuse Treatment

The third factor cited for the Governor's unsuitability for parole was Petitioner's inconsistent substance abuse treatment.  The Governor provided that "in light of [Petitioner's] history of drug and alcohol abuse, and drug sales, I am concerned by [Petitioner's] sporadic participation in substance abuse treatment in prison."  See Resp't Lodged 3-Governor's decision at 2.  The Governor also noted that:

> When asked about substance-abuse treatment, [Petitioner] told his 2005 mental-health evaluator that "it is not necessary treatment for him."  I disagree, particularly because the 2005 evaluator also noted that [Petitioner] is "slightly more likely than the average citizen to become involved in violence."  Coupled with his history of substance abuse, this evaluation signals to me that [Petitioner] would benefit from additional – and consistent – participation in substance-abuse treatment in prison.

See Resp't Lodged 3-Governor's decision at 2-3.  While the Court finds that the Governor's nexus is tenuous between Petitioner's inconsistent substance abuse treatment and his current dangerousness in light of Petitioner's twenty-six years of institutional remission, the Court nonetheless concludes

---

[7]The 2007 Report provides the following: "The inmate agrees with the review of the crime told by the inmate presented in Dr. Payne's report dated 6/11/02 and presented to the Board of Prison Terms."  See Petitioner's Exh. C-2007 psychological report at 5.

1    that the Governor has satisfied the "some evidence" standard.[8]

2           Petitioner's 2002 and 2005 psychological reports concluded that Petitioner had a diagnosed

3    substance abuse problem.[9]  Petitioner's 2002 and 2005 psychological reports indicated that

4    Petitioner's polysubstance abuse has been in institutional remission.  See Petitioner's Exh. C-2002

5    psychological report at 4 and 2005 report at 5.  The record shows that Petitioner had been drug and

6    alcohol free for twenty-six years.  See Petitioner's Exh. C-2007 psychological report at 3.

7    Petitioner's psychological report noted that Petitioner had episodically participated in AA.  See

8    Petitioner's Exh. C-2005 psychological report at 3.

9           Despite Petitioner's twenty-six year drug and alcohol remission, the Governor's finding that

10   Petitioner posed a current unreasonable risk of danger meets the "some evidence" standard in light of

11   the following: (1) Petitioner's commitment offense was related to the sale of drugs and Petitioner

12   admitted that he had consumed alcohol on the day of the offense (see Transcript at 11); (2) Petitioner

13   has a diagnosed substance abuse problem (see Petitioner's Exh. C-2002 psychological report at 5 and

14   2005 report at 6); (3) Petitioner's substance abuse treatment has been inconsistent since his

15   incarceration in 1982 (see Petitioner's Exh. C-2005 psychological report at 3); (4) Petitioner told his

16   2005 mental health evaluator that he was not participating in AA consistently because he did not

17   think that he had a problem with alcohol or drugs (see Petitioner's Exh. C-2005 psychological report

18   at 3); and (5) as noted by the Governor, Petitioner's 2005 psychological report concluded that

19   Petitioner was "slightly more likely than the average citizen to become involved in violence."  See

20   Petitioner's Exh. C-2005 psychological report at 7.  Accordingly, the Governor's finding that

21   Petitioner's inconsistent substance abuse treatment is probative of Petitioner's current dangerousness

22   is supported by "some evidence," and there is a rational nexus between the evidence cited by the

23   Governor and Petitioner's risk of danger if released in light of the role drugs played in Petitioner's

24   _____

25        [8]In addition, the Court finds the nexus to be tenuous in light of Petitioner's twenty-six years of institutional remission
     and given that Petitioner's 2005 psychological report noted that "it appears unlikely that [Petitioner] is at a significant risk
26   of relapse if returned to an uncontrolled environment...."  See Petitioner's Exh. C- 2005 psychological report at 6.

27        [9]Petitioner's psychological report from 2007 noted that Petitioner had a history of drug and alcohol *use* but that there
     were conflicting reports from various clinicians and the inmate about whether Petitioner had a diagnosed substance abuse
28   problem.  See Petitioner's Exh. C-2007 psychological report at page 5. (emphasis added).  The 2007 psychologist did not
     express an opinion on whether he thought Petitioner had a substance abuse problem.

1    commitment offense.

2          D.    Governor's Fourth Reason for Denying Parole: Limited Participation in Vocational
                 Programs
3

4          The final factor cited for the Governor's unsuitability for parole was Petitioner's limited

5    participation in vocational programs in prison.  The Governor stated that maintaining regular

6    involvement in vocational training would provide Petitioner with the knowledge and skills necessary

7    to succeed upon release from prison.  See Resp't Lodged 3-Governor's decision at 3.

8          The Court does not find that Petitioner's lack of recent vocational training to be probative of

9    current dangerousness given that Petitioner has viable parole plans, including a job offer from a

10   trucking company as a loader/unloader or as a driver if he is released from prison.  See Transcript at

11   19, 56.  Accordingly, because the Petitioner has made realistic plans for release, the Court does not

12   find Petitioner's lack of current vocational training to be probative of current dangerousness.

13

14

15                                    **CONCLUSION**

16

17         Here, the Governor relied on Petitioner's commitment offense, apparent lack of insight,

18   inconsistent drug abuse treatment, and lack of current vocational training in determining that

19   Petitioner was unsuitable for parole.  The Court cannot say that the Superior Court's determination

20   that there is "some evidence" sufficient to support the Governors decision was objectively

21   unreasonable.  Although the Court does not find that the Petitioner's commitment offense, apparent

22   lack of insight, and lack of vocational training are probative of current dangerousness, the Court

23   nonetheless finds that there was "some evidence" to support the Governor's decision that Petitioner

24   posed a current unreasonable risk of danger to the public.  Therefore, Petitioner is not entitled to

25   habeas corpus relief.

26         A state prisoner seeking a writ of habeas corpus has no absolute entitlement to appeal a

27   district court's denial of his petition, and an appeal is only allowed in certain circumstances.  Miller-

28   El v. Cockrell, 123 S.Ct. 1029, 1039 (2003).  The controlling statute in determining whether to issue

a certificate of appealability is 28 U.S.C. § 2253, which provides that a circuit judge or judge may issue a certificate of appealability where "the applicant has made a substantial showing of the denial of a constitutional right."  Where the court denies a habeas petition, the court may only issue a certificate of appealability "if jurists of reason could disagree with the district court's resolution of his constitutional claims or that jurists could conclude the issues presented are adequate to deserve encouragement to proceed further."  Miller-El, 123 S.Ct. at 1034; Slack v. McDaniel, 529 U.S. 473, 484 (2000).  While the petitioner is not required to prove the merits of his case, he must demonstrate "something more than the absence of frivolity or the existence of mere good faith on his . . . part." Miller-El, 123 S.Ct. at 1040. In the present case, the Court finds that reasonable jurists could find the Court's determination that Petitioner is not entitled to federal habeas corpus relief debatable; thus Petitioner's claim is deserving of encouragement to proceed further.  Consequently, the Court hereby GRANTS a certificate of appealability.


## RECOMMENDATION

Accordingly, the Court RECOMMENDS that:

(1) The petition for writ of habeas corpus be DENIED WITH PREJUDICE;

(2) the Clerk of Court be DIRECTED to enter judgment for Respondent; and

(3) A Certificate of Appealability be GRANTED for Petitioner to pursue an appeal.

This Findings and Recommendation is submitted to the Honorable Oliver W. Wanger, United States District Court Judge, pursuant to the provisions of 28 U.S.C. § 636(b)(1)(B) and Rule 304 of the Local Rules of Practice for the United States District Court, Eastern District of California. Within thirty (30) days after being served with a copy, any party may file written objections with the court and serve a copy on all parties.  Such a document should be captioned "Objections to Magistrate Judge's Findings and Recommendation."  Replies to the objections shall be served and filed within ten (10) *court* days (plus three days if served by mail) after service of the objections. The Court will then review the Magistrate Judge's ruling pursuant to 28 U.S.C. § 636(b)(1)(c).  The parties are advised that failure to file objections within the specified time may waive the right to

1   appeal the District Court's order.  <u>Martinez v. Ylst</u>, 951 F.2d 1153 (9th Cir. 1991).

2   IT IS SO ORDERED.

3

4   **Dated:** ___**November 2, 2010**___   _____**/s/ John M. Dixon**_____
                                        UNITED STATES MAGISTRATE JUDGE

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28